Desmond A. TUTTLE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9615.

Court of Appeals of Alaska.

Jan. 18, 2008.

David D. Reineke, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

COATS, Chief Judge.

Desmond A. Tuttle entered a plea of no contest to attempted misconduct involving a controlled substance in the third degree, a class C felony.[1] In entering his plea, Tuttle reserved his right to raise an issue on appeal: that the evidence against him stemmed from an illegal arrest. We agree with Tuttle and reverse his conviction.

*Factual and procedural background*

At the evidentiary hearing, Brett D. May testified that he worked for the Riverside House, a hotel in Soldotna. May testified that on October 27, 2004, he observed Tuttle urinating in the hallway and fidgeting with some doors. May said he asked Tuttle what he was doing, but Tuttle ignored him. May called the police.

Soldotna Police Officer Jezel Stoneking was dispatched to the Riverside House at approximately 2:30 a.m. Officer Stoneking testified that dispatch informed her that the desk clerk had observed an individual who urinated either in the lobby or the hallway. Officer Stoneking started her audio recorder and then walked into the hotel lobby. The desk clerk pointed down the hallway towards a person who matched the description provided by dispatch. Other than the clerk and this other individual, no one else was around.

Officer Stoneking made contact with Tuttle in front of Room 104. This room was in fact Tuttle's room, which he had paid for in advance. Officer Stoneking observed that Tuttle's pants appeared damp and that he seemed intoxicated. At this time, Officer Stoneking did not know that Tuttle was a guest at the hotel. However, Tuttle was attempting to open the door to Room 104 with what Officer Stoneking thought looked like a car key. Officer Stoneking admitted

---

1. AS 11.71.030(a)(1) and AS 11.31.100.

that Tuttle told her that Room 104 was his room.

Due to Tuttle's demeanor, which Officer Stoneking described as disoriented and "almost hostile," she requested backup. Officer Duane Kant arrived to assist within a few minutes. Officer Stoneking testified that Tuttle "was getting loud enough to where at some point other hotel guests· were disturbed." She thought that one guest looked out of a nearby room but closed the door after seeing two police officers with Tuttle. Officer Stoneking ·testified · that she told Tuttle to settle down.

Eventually the officers· got Tuttle's name from him and reported it to dispatch. Dispatch informed them that Tuttle had previously possessed a bullet proof vest, a knife, and a gun. Officer Stoneking testified that based on Tuttle's behavior and the dispatch report, she removed her pepper spray and concealed it in her right hand. She testified that Tuttle could see she had something in her hand. Both officers testified that during the encounter Tuttle was subject to wide mood swings ranging from passive to aggressive, raising and lowering his voice. Based on Tuttle's demeanor and raised voice, the officers arrested Tuttle for disorderly conduct.

Tuttle testified that when the officers showed up, he told them who he was and that he was okay. Tuttle denied going to different doors before he got to his door. Tuttle also denied ever being addressed by the hotel clerk. Tuttle testified that the officers denied him access to his hotel room and that Officer Stoneking was loud at times and combative. Further, he testified that only after he was handcuffed did he get loud because he was trying to figure out what was happening.

Officer Stoneking transported Tuttle to the Wildwood Pretrial Facility. Upon departing the facility, she checked the back of her patrol car. Officer Stoneking found a clear plastic bag containing approximately thirteen grams of white powder on the rear floorboard of the patrol car. A subsequent field test of this substance indicated that the substance was cocaine. Officer Stoneking had checked the patrol car prior to the start of her shift. She had not had anyone else in the rear of the car that night before Tuttle.

Officer Stoneking returned to the hotel and guarded the door to Room 104 while Officer Kant secured a search warrant. A warrant was issued and the search resulted in the seizure of two plastic bags containing cocaine with a combined weight of sixteen and one-half grams, a small electronic scale, aluminum foil in pieces for packaging, and a loaded handgun.

The State indicted Tuttle on one count of misconduct involving a controlled substance in the third degree, a class B felony,[2] and two counts of misconduct involving a controlled substance in the fourth degree, a class C felony.[3] (The charges were later amended to one count of attempted misconduct involving a controlled substance in the third degree, two counts of misconduct involving a controlled substance in the fourth degree, and one count of disorderly conduct.) Tuttle filed a motion seeking to suppress the evidence against him on the ground that the officers lacked probable cause to arrest him for disorderly conduct.

Superior Court Judge Charles T. Huguelet conducted an evidentiary hearing. We have previously set out a summary of the testimony at the evidentiary hearing. In. addition, the State presented the audio recording that Officer Stoneking made during the incident. At the conclusion of the evidentiary hearing, Judge Huguelet found that, during the interview with the police, Tuttle was going back and forth between being "out of it and being hostile. He started shouting, they weren't able to calm him down, and they took him into custody." Judge Huguelet found that the police had probable cause to arrest Tuttle for disorderly conduct. He accordingly denied Tuttle's motion to suppress the evidence obtained by the police.

*Why we conclude that the police did not have probable cause to arrest Tuttle for disorderly conduct*

Tuttle was arrested for disorderly conduct pursuant to AS 11.61.110(a)(2):

---

2.  AS 11.71.030(a)(1).

3.  AS 11.71.040(a)(3)(A).

A person commits the crime of disorderly conduct if . . . in a public place or in a private place of another without consent, and with intent to disturb the peace and privacy of another or with reckless disregard that the conduct is having that effect *after being informed that it is having that effect,* the person makes unreasonably loud noise[.] [4]

The State charged Tuttle with recklessly disturbing the peace and privacy of others. Tuttle argues that this statute requires the police to warn a person that his conduct is having the effect of disturbing the peace and privacy of another.

The State has provided this court with copies of the audio recording that Officer Stoneking made of the incident. Officer Stoneking testified that the recording was an accurate representation of the incident. (She did state that her voice would seem louder because the microphone was clipped to her shirt pocket, relatively close to her mouth.) Judge Huguelet stated that because the incident was recorded "we know what happened." The State concedes that the facts that the trial court found "are based upon the audio recording." The State argues that, during the incident, the police told Tuttle to settle down, not raise his voice, and not yell. The State also relies on the following exchange in arguing that the police told Tuttle that he was creating a disturbance by making unreasonably loud noise:

| | |
|---|---|
| Tuttle: | What are you doing here bothering me? |
| Officer Kant: | We got called. |
| Tuttle: | Okay. |
| Officer Kant: | Creating a disturbance. |
| Tuttle: | Okay. Okay. I am? |
| Officer: | Uh-huh (affirmative). |

Alaska Statute 11.61.110(a)(2), the subsection of the disorderly conduct statute under which Tuttle was charged, appears to be designed to criminalize disturbing the peace and privacy of other people by making "unreasonably loud noise." Under the statute, if someone is recklessly making unreasonably loud noise and then is specifically informed that the noise is disturbing the peace and privacy of other people, the person commits the crime of disorderly conduct if he then persists in making unreasonably loud noise. The statute appears to require a specific warning. This warning narrows the conduct to which the statute applies and makes the statute less subject to claims of vagueness and arbitrary enforcement.

First, there is no indication that Tuttle was making "unreasonably loud noise" before the officers approached him. May testified that he was the person who called the police about Tuttle. May testified that he saw Tuttle urinating in the hallway. He saw Tuttle with a key in his hand trying to open some doors, apparently because Tuttle did not know which room was his. When he asked Tuttle what he was doing, Tuttle ignored him. May then called the police.

We have carefully reviewed the recording of the incident. Shortly after the police arrived, Tuttle asked the police why they were bothering him. In response, Officer Kant told Tuttle that the police were called because Tuttle was "creating a disturbance." But this exchange did not inform Tuttle that he was making unreasonably loud noise that was disturbing others. In fact, the act that prompted May to call the police had nothing to do with Tuttle making unreasonably loud noise.

It is true that Officer Stoneking told Tuttle not to raise his voice and later told him again not to raise his voice. She also told him "don't yell." Apparently Tuttle reacted when Officer Stoneking took out her pepper spray. But there is simply no evidence that the police informed Tuttle that he was disturbing the peace and privacy of others by making "unreasonably loud noise." And from our review of the audio recording, it simply does not appear that Tuttle was making "unreasonably loud noise."

In reviewing the superior court's denial of a motion to suppress, we view the facts in the light most favorable to upholding the trial court's ruling.[5] We accept the findings of the trial court unless they are clearly erroneous; whether those factual findings support the trial court's legal conclusions is a ques-

---

4. Emphasis added.

5. *Crawford v. State,* 138 P.3d 254, 258 (Alaska 2006) (citing *State v. Joubert,* 20 P.3d 1115, 1118 (Alaska 2001)).

tion of law that we decide de novo.[6] From our review of the record, including the recording, we conclude that Judge Huguelet's finding that Tuttle was making "unreasonably loud noise" is clearly erroneous. Furthermore, there was no evidence to support the conclusion that Tuttle made unreasonably loud noise after being informed that he was making such noise and that it was disturbing the peace and the privacy of others.

*Conclusion*

Accordingly, we conclude that Judge Huguelet erred in refusing to grant Tuttle's motion to suppress. We therefore REVERSE Tuttle's conviction.

Reversed and remanded.

MANNHEIMER, Judge, concurring.

MANNHEIMER, Judge, concurring.

I write separately to clarify the reasons why I agree that Tuttle's arrest for disorderly conduct was unlawful.

The State argues, and Judge Huguelet found, that the police had probable cause to believe that Tuttle had violated AS 11.61.110(a)(2). This portion of the disorderly conduct statute declares that it is a crime for a person (1) to "make[ ] unreasonably loud noise" (2) with reckless disregard for the fact that this unreasonably loud noise is "disturb[ing] the peace and privacy" of at least one other person, and (3) "after being informed that [the noise] is having [this] effect"—*i.e.*, after being informed that the noise is disturbing someone else's peace and privacy.

Putting all three elements of this offense together, it is apparent that a person does not violate this statute merely by making an unreasonably loud noise that disturbs other people's peace and privacy. Rather, the statute requires proof that the person *persisted* in making unreasonably loud noise *after* being explicitly warned that the noise was disturbing other people's peace and privacy.

In Tuttle's case, the police were called because the hotel clerk saw Tuttle urinating in the hallway and trying to get into one of the rooms. (The hotel clerk either did not know or failed to mention that Tuttle was a registered guest at the hotel.)

The audio recording made by Officer Stoneking shows that, shortly after the police contacted Tuttle, he asked the officers, "What are you doing here, bothering me?" The other officer on the scene, Officer Kant, replied, "We got called [because you were] creating a disturbance."

In its brief to this Court, the State suggests that this was the required warning to Tuttle—a warning that he was making an unreasonably loud noise that was disturbing the peace and privacy of other people. But this view of the facts is demonstrably false.

The police were not called to the hotel because Tuttle was making loud noises. Rather, the hotel clerk summoned the police because Tuttle had urinated in the hallway and was fumbling at the door to a room. Thus, to the extent that Tuttle might be said to have created a "disturbance" before the police arrived, that disturbance had nothing to do with noise.

Moreover, the audio recording of the police contact with Tuttle shows that, at this point in the discussion, Tuttle had not yet raised his voice to any significant degree. Both he and the officers were speaking in relatively normal conversational tones. No one in Tuttle's situation would have interpreted Officer Kant's remark about a "disturbance" as an accusation that Tuttle was currently making unreasonably loud noise.

The State also relies on the fact that Tuttle, after initially being fairly calm, raised his voice to the officers two or three times—prompting the officers to repeatedly advise him to lower his voice and calm down. But the audio recording reveals that the officers never informed Tuttle that he should quiet down because he was disturbing the other hotel guests. Rather, the audio recording shows that the officers were trying to de-escalate their encounter with Tuttle.

Tuttle was obviously intoxicated, and his mood began to swing as the police encounter progressed. It appears that the officers

6. *Id.*

were trying to keep Tuttle's emotions in check, so that their encounter with him did not turn violent. But whatever the officers' motivation for telling Tuttle to calm down, it is clear that they never said anything to Tuttle to suggest that his raised voice was disturbing the other guests, or that this was the officers' concern.

At the conclusion of the evidentiary hearing in this case, Judge Huguelet found—based on the testimony of the officers, and also based on his listening to the audio record of the encounter—that Tuttle "started shouting and [the officers] weren't able to calm him down". Based on this fact, Judge Huguelet concluded that "[t]here was ample probable cause for [Tuttle's] arrest."

The first part of Judge Huguelet's factual finding is confirmed by the evidence; Tuttle did start shouting—after the officers refused to leave him alone, and after Officer Stoneking took out her pepper spray, apparently making preparations to subdue Tuttle. However, the second part of Judge Huguelet's finding is clearly erroneous. The officers *were* able to calm Tuttle down. Even though Tuttle remained upset with the officers, when the officers asked him to turn around and present his hands for handcuffing, Tuttle did so without a struggle.

But even if the facts had been as Judge Huguelet described, there would still be no probable cause to arrest Tuttle for violating AS 11.61.110(a)(2).

Tuttle did indeed raise his voice, and he even began shouting, after the police officers refused to leave him alone, and after Officer Stoneking picked up her can of pepper spray. But the State did not prove that Tuttle's raised voice was unreasonable under the circumstances. Tuttle had already explained himself to the officers (that is, he explained that he was trying to get into his own room

at the hotel), but the officers refused to leave him alone, and instead they began preparing to subdue him.

It is true that the officers had probable cause to believe that Tuttle had earlier urinated in the hotel hallway. But this act does not appear to be a crime under state law. Even assuming that this act was a misdemeanor under a local ordinance, the police had no authority to arrest Tuttle for that misdemeanor-because it did not occur in their presence.[1]

Thus, the question appears to be whether a person acts unreasonably by raising their voice after police officers contact the person, question the person, and then refuse to stop when the person asks to be left alone. The State presents no authority for the proposition that a raised voice under these circumstances would constitute an "unreasonably loud noise" within the meaning of the disorderly conduct statute.

Moreover, even if Tuttle's raised voice had constituted an "unreasonably" loud noise under the circumstances, a further question remains: was Tuttle ever apprised that his raised voice was disturbing the peace and privacy of others? The answer, as revealed by the audio recording, is "no". To the extent that Judge Huguelet might have found otherwise, that finding is clearly erroneous.

For these reasons, I agree with my colleagues that the police did not have probable cause to arrest Tuttle for disorderly conduct.

---

1. *See* AS 12.25.030–035; *see also Joseph v. State,* 145 P.3d 595, 600–01 (Alaska App.2006).